Opinion of
the Court.
THIS is an appeal from a decree of the general court dismissing the complainant’s bill with costs. The bill states, that Joseph M’Nitt, in the year 1776, marked and improved for himself 1,000 acres of land on Elkhorn, and that, by the act of the Virginia assembly passed in the year 1779, he became entitled to the pre-emption thereof; that the said Joseph M’Nitt departed this life in the year 1776, childless and intestate, leaving the complainant, Bernard M’Nitt, his eld *61 est brother and heir at law, and consequently entitled to the pre-emption aforesaid: That when the commissioners under the act of 1779 sat in this country for adjusting the claims to unpatented land, a claim to the aforesaid pre-emption was fraudulently laid in by, or in behalf of a certain William M’Nitt, as heir at law of the said Joseph M’Nitt; and that the commissioners, on the 21st day of February 1780, granted a certificate in the name of William M’Nitt, as heir at law as aforesaid, of his right to the pre-emption of the said 1,000 acres. The bill further charges, that on the first day of February 1733, a pre-emption warrant having been obtained by virtue of said certificate, an entry was made thereon, in the name of Jacob Myers; which entry was amended on the 30th of May 1783: That the said entry was surveyed, and a patent obtained thereon from Virginia, on the 6th of May 1788, in the name of Jacob Myers; which certificate, entry, survey and are made exhibits.
Under that act, the commissioners were authorised & bound to grant pre-emptions to the heirs at law of improvers, although the improvers had died long before the passage of the act.
If their authority in this respect were doubtful, on the law itself, their having uniformly done so would have settled the question, on the principle of cotemporaneous exposition.
The decision of the com'rs. as to the person who was heir at law to the improver is not conclusive; the real heir may impeach it.
The bill charges, that the said certificate and entry were obtained and made by collusion between William M’Nitt and Jacob Myers, and that Myers had notice, before he paid any consideration for any part of said pre-emption, and before he obtained the commonwealth’s grant, that the complainant was, and that William M’Nitt was not, the true heir at law of Joseph M’Nitt, deceased. It is also alleged in the bill, that although the patent issued in the name of Jacob Myers for the whole 1,000 acres, and he was only entitled to one half thereof, by contract with William M’Nitt, for clearing the pre-emption out of the offices, and that the other moiety was held by him in trust for the said William M’Nitt; that Lewis Craig became entitled to the first mentioned half, and a conveyance of the whole was made to him by Myers, it being designed that Craig should hold the other half in trust for William M’Nitt; that James M’Bride fraudulently purchased of William M’Nitt the half of said pre-emption reserved by him in his contract with Myers, but that M’Bride never had a conveyance; that M’Bride afterwards sold the same to the appellee, David Logan, who has obtained a conveyance from Craig; and the complainant expressly charges that Logan has never paid any consideration for said land; or, if he has, that, before the payment thereof, and before he obtained a conveyance, he had *62 full notice that the said William was not, and that the complainant was, the true heir of Joseph M’Nitt.
The complainant, in his bill, admits that, by the custom of the country, Myers was entitled to one half, for clearing the land out of the offices, and he is willing the benefit of the custom should be extended to Myers and his representative, Craig; but prays that the defendant, Logan, may be decreed to convey him the other moiety, to which he contends he is entitled.
David Logan, in his answer, which was sworn to by him on the 10th of January 1804, admits that Joseph M’Nitt did, in the year 1776, mark out and improve for himself 1,000 acres of land, and that by virtue of the act of 1779, he became entitled to the pre-emption thereof, and that he departed this life childless, but whether intestate or not, he does not know. He says he does not know that Bernard M’Nitt is the heir at law of Joseph, although he has heard it so reported; he, therefore, prays the complainant may be required to prove it. He admits that the certificate of the right of pre-emption was obtained, and the entry and survey made as stated in the bill. He does not admit, but denies, that the said entries were made by collusion between Jacob Myers and William M’Nitt; and he denies that Myers had notice, either before the payment of the consideration or the issuing of the grant, that the complainant was the heir at law of Joseph M’Nitt.
The answer of Logan admits that Jacob Myers was entitled to one half of the pre-emption, for clearing it out; but denies that he held the other half in trust for William M’Nitt; because, he says, that M’Bride purchased the whole pre-emption of William M’Nitt, on the 23d of November 1780, and Myers having cleared it out, M’Bride agreed to let him have one half for so doing. He says he purchased of M’Bride, and paid him the full consideration for it. He admits that he was told by Lewis Craig, that Bernard M’Nitt was the heir at law, and that about ten years ago, (that is, before the date of his answer,) David Torrence gave him the same information. And the defendant, by way of avoidance, further alleges that Joseph M’Nitt, deceased, and William M’Nitt, prior to, and at the time Joseph M’Nitt came to Kentucky to improve land, worked in partnership at the blacksmith’s trade, and that it was agreed between them, that William should stay in *63 Pennsylvania and carry on the trade, and that Joseph should come to Kentucky and make an improvement for the joint benefit of both; and that if either died without children, his share of the land obtained by virtue thereof, was to go to the survivor.
Thus stands the case on the bill and answer. A variety of depositions were taken by the parties, and at the hearing of the cause the general court decreed a dismission of the complainant’s bill with costs, from which decree he has appealed to this court.
Several questions of fact, and several important questions of law, present themselves; and the questions of law have been argued with great ability, by the gentlemen of the bar on both sides. We will consider them in the order in which they seem naturally to arise.
The first is, was Bernard M’Nitt the heir at law of his brother, Joseph M’Nitt, deceased? Upon this question there is no room left for the mind to doubt, either as to the fact or the law involved in the question. As to the facts, the proofs are clear and conclusive, that Bernard is the eldest brother of Joseph. It is also clearly proved, that Joseph departed this life in the year 1776. As to the law, it is clear, that the laws of Virginia then in force, regulating rights of inheritance, and pointing out who ought to be heir, must govern, although Bernard, Joseph and William M’Nitt were all inhabitants of, and resident in Pennsylvania; for it is a settled principle, that in questions concerning the realty, the laws of the country having dominion over the soil, shall govern; and the land, the subject of this suit, was, and continued to be, within the domain of Virginia, until the separation of Kentucky from the mother state. By the laws of Virginia, as they stood in 1776, and until the act of 1785 regulating descents took effect, Bernard, being the eldest brother of Joseph, who died without issue, was his heir at law.
The second question which presents itself, is, had Bernard M’Nitt, as heir at law to Joseph, a right to a certificate for a pre-emption of 1,000 acres, by virtue of the improvement made by Joseph, who died in 1776? The negative has been strongly contended for by the counsel for the appellee. He argued, that the act of improving, in 1776, gave no title, and created no estate in Joseph M’Nitt; that the right to land, for improving, originated upon the passage of the act of 1779, and *64 that, consequently, Joseph having died three years Prior the passage of that act, no estate could descend from him upon his heir at law, at his death, none having vested in him while living. He insists, that the estate could not be in abeyance from the death of Joseph until the passage of the act of 1779, and that act was intended to have a prospective, and not a retrospective operation; and, therefore, he insists that Bernard cannot take the land by descent. The general doctrines relating to descents, urged by the counsel, will not be controverted; but their application to the case before the court cannot be conceded. For, admitting that in general an estate cannot be in abeyance, and that in general no estate can pass to the heir by descent, where the ancestor had none vested in him at his death, and admitting that Joseph had no estate vested in him at his death, in 1776, by the act of improving, the act being unauthorised by any law then existing; still, whether Bernard had a right to claim, or could take as heir to Joseph, will depend, not on these rules of the common law, but upon the intention of the legislature, to be collected from the act of 1779. If it should appear from the statute, that the legislature intended the heir at law should take, or, in other words, should represent his ancestor, these rules of the common law must yield to the statute, and the statute must be considered as creating an exception to these general rules, and permitting the heir, these rules notwithstanding, to take by descent, as the representative of his ancestor; or if not so, that he shall by right of purchase. The counsel for the appellee, seemingly aware of this, has contended that the act of 1779 did not authorise the court of commissioners to grant pre-emptions to the heirs of decedents; that the act gave only a right to purchase, and that the services for which that right was given, were merely personal, and that the reward was intended by the legislature to be personal also. Whether he is correct, or not, will depend on the sound exposition of the act itself.
We will premise, that the act, so far as relates to rights granted thereby for improving, must be considered as a remedial statute, and that it ought, therefore, to be liberally and beneficially expounded. The legislature should be presumed to be conversant of, and intending to act consistent with the universal springs of *65 human action; and it is believed none more universally prevails, than the desire which men have to provide for their offspring and families. For this, will men undergo every hardship and danger; and but for this, it is believed few of the early adventurers in this country would have encountered the dangers and hardships to which they were exposed. When the legislature was extending its bounty to those hardy adventurers, and about to make them some compensation for their services, and for the difficulties and risks encountered by them, can we suppose the legislature were regardless of the motives which must have excited them to action? Can we presume that the legislature intended to make a compensation for the services performed, and dangers encountered, to the man who was fortunate enough to escape with his life, and leave unprovided the family of him who lost his life by the hand of the savage, in performing similar services, and encountering the same or similar dangers? Can it be presumed that the legislature intended to do justice by halves? We say justice, because the act recognizes the making of an improvement as a service, and as a part of the consideration paid for the right of pre-emption.
Even if the act were perfectly silent with respect to the right of the heir, or the power of the court of commissioners to grant to the heir, we would hesitate much, before we would pronounce that if the improver had deceased, the pre-emption ought not to have been granted by the court of commissioners to his representatives. But we are relieved from this difficulty, by the expressions of the act, by which we conceive the right is secured to the heir of a deceased improver, and the power of the court of commissioners to grant to the heir is clearly recognized. In the 8th section of the act, (Chan. Rev. 93,) it is provided, that in all cases of disputes upon claims for settlement, the person who made the first actual settlement, his heirs or assigns, shall have the preference. In all disputes for the right of pre-emption, for improvements made on the land, the persons, their heirs or assigns, respectively, who made the first improvement, and the persons to whom any right of pre-emption, on account of settlement or improvement, shall be adjudged, shall fix the quantity at their own option, at the time of the judgment, so as not to exceed the number of acres respec *66 tively allowed by this act, or to interfere with the just rights of others.
If, in the case of settlement, the heir had no right to the grant, or if the court of commissioners had no right to make the grant to him, it would be absurd, to say, that in case of disputes, the heir of him who made the first actual settlement should have the preference; and if the heir of a deceased improver could not claim, or if the court of commissioners, under the law, had no power to grant him a pre-emption for the improvement made by his deceased ancestor, it would be absurd in the extreme, to require that the heir should fix the quantity of the pre-emption at the time of the judgment, or to provide that the heir of the first improver should have the preference. From this provision in the act, we are clear, not only that the heir at law of a deceased improver had a right to claim, but that the commissioners were in duty bound to grant him the pre-emption of 1,000 acres, on account of the improvement made by the decedent; and that, if the heir cannot take by descent, by the rules of the common law, the word heirs, in the act, must be considered as descriptio personarum who should have the right of purchase or pre-emption, in case of the death of the improver; and that he shall take by right of purchase, by the description of heir, and that this right was vested in him on the passage of the act of 1779.
If it should be supposed that this provision in the act relates only to those cases where the improver died after the passage of the act of 1779, we answer, that such construction is inconsistent with the rule before laid down, that a remedial statute should be liberally and beneficially construed; that such a discrimination, if intended by the legislature, would most probably have been made in explicit terms; that the discrimination would be unequal and unjust, and therefore ought not to be raised by implication; and that it would be contrary to the cotemporaneous construction of the act, which, in doubtful cases, ought not to be departed from. By cotemporaneous exposition, we mean that given by the commissioners, who, in many instances, granted certificates, as well to the heirs of those improvers who died before, as those who died after the passage of that act.
The certificate of the commissioners is conclusive on all claiming by subsequent appropriation, but may be impeached by those claiming under prior vested rights.
The third question is, is Bernard M’Nitt concluded by the certificate of the court of commissioners, from claiming the pre-emption as heir to Joseph, the commissioners having granted the certificate to William, as heir? It has been contended, that the certificate of the commissioners, in all points, appearing on the face of the record to have been adjudicated by them, is final and conclusive. This position cannot be conceded, in the latitude contended for. In some cases, the certificate is clearly conclusive; but in others, it cannot be so considered, without violating the fundamental principles of law and justice. It is admitted, that wherever the party attempting to impeach the certificate, and having no previous vested right, claims either by a subsequent grant of the commissioners, or by any other subsequent act of appropriation, the certificate, as to him, should be considered as conclusive. The commonwealth, having appointed her officers to judge between herself and her own citizens, ought not to question that adjudication; and having, by her court, granted her right to an individual, she ought not to question the propriety of that grant, especially after receiving the consideration. She is stopped by her own act to allege any thing against the validity of the grant. Another individual, claiming under the commonwealth by a subsequent act of appropriation, can be in no better situation. The commonwealth, having once parted with the whole of her right, cannot again transfer that right, or make a second grant to another, by a subsequent appropriation. But where the party who attempts to call in question the certificate, or any fact stated therein, had a previous vested right, existing anterior to the adjudication of the commissioners, we conceive he cannot, upon any principle of law, be concluded thereby, unless it is shown that he actually appeared before the commissioners, and litigated that right, and that it was adjudged against him. It is an established principle of the common law, as well as a fundamental principle of justice, that no man’s right shall be prejudiced, or taken away from him, by an adjudication to which he is neither party nor privy; and we can discover nothing in the act of 1779, impairing this fundamental principle.
These doctrines, we are persuaded, are not contravened by any former decision on the subject of the le *68 gal effect of a certificate. In the case of Consilla vs. Briscoe, it is true, the old supreme court use the general expressions, that Consilla having made his improvement in 1775, cannot be controverted; for the commissioners’ certificate declares that such was the case. Hughes’ Rep. 45. The assertion, as it related to the case then before the court, was correct; for Consilla had obtained the first certificate for an actual settlement, and Briscoe claimed under a subsequent certificate for a village right, which the law permitted to be located only upon waste and unappropriated land. These expressions of the court should, therefore, be understood with reference to the subject-matter before them, and not as establishing a general principle. Upon this view, the case of Consilla and Briscoe is consistent with the principles we now hold as correct.
That the certificate of the commissioners is not conclusive evidence of right in the party to whom it is granted, against another having a precedent right, is evinced by the case of Briscoe vs. Speed, Hughes’ Rep. 41. If the principles here laid down could require the aid of precedent, we apprehend they are fully recognized and clearly laid down in the case of Kenton vs. M'Connell, Hughes’ Rep. 156. The court, in that case, after showing, in the second point considered by them, that the certificate is conclusive against those whose rights originate subsequent to the certificate, go on, in the consideration of the third question, to determine, that where any person had by law a vested right to land, when a certificate was fraudulently or erroneously obtained for it by another, the privilege of contesting the certificate is evidently given to the person thus injured.
It has been shown, in the consideration of the second question, that Bernard M’Nitt had a vested right of purchase conferred on him, upon the passage of the act of 1779, anterior to the sitting of the commissioners, in the character of heir to his deceased brother. The commissioners granted that right to William M’Nitt, not in his own individual right, but as heir to Joseph M’Nitt, deceased. Bernard was neither party nor privy to that decision. The grant to William, as heir, if not fraudulently procured, was at least erroneously made, to the prejudice of Bernard’s previously vested right; and, from the principles before laid down, it follows, *69 that Bernard is not concluded by the certificate, from showing that he is the true heir, and consequently entitled to the land. If William was before the court, and the contest was between Bernard and him, he having assumed a character, not belonging to him, but to Bernard, and thereby having obtained, in that character, a grant which by law belonged to Bernard, he would, in equity, be considered as holding the estate in trust for Bernard, and be decreed to convey to him. The defendant, Logan, can be in no better situation, unless some matter set up by him by way of avoidance, can aid him.
A mala fide purchaser will be protected, if he derives title from a bonafide purchaser.
We will here premise, that Logan, before he obtained a legal title for the 500 acres of land claimed by the appellant, had full notice of the appellant’s title as heir at law. He, therefore, cannot be considered in the light of a purchaser for a valuable consideration without notice. But he insists, in his answer, that Jacob Myers, to whom the grant issued, and through whom he derives his title, was a purchaser for valuable consideration without notice.
The fourth inquiry, therefore, will be, can Myers be considered, as to the moiety of the pre-emption claimed by the appellant, as a bona fide purchaser for a valuable consideration without notice, so as to protect Myers, if he were before the court, and the contest were between him and Bernard M’Nitt? For if Myers was a purchaser for a valuable consideration without notice, so as to protect himself, David Logan, who derives title through him, although a purchaser with notice, shall be protected; but if Myers would not be protected, then Logan cannot be. It is a maxim in equity, that where the equity is equal, the law shall prevail. Proceeding upon this maxim, courts of chancery have laid it down as an established principle, that where a purchaser has fairly advanced his money, and obtained legal title without notice, his title shall not be questioned; because, having advanced his money fairly, and obtained the legal title without notice of his adversary’s claim, creates an equity in him equal to the complainant’s. His conscience is not affected; there is no more reason that he should lose his money, than that the complainant should lose the land; and having got the advantage at law, equity will not interfere to his prejudice. But can this reasoning, and these prin *70 ciples apply to the case of Myers? We are of opinion that, as to the moiety of the pre-emption claimed by the appellant, they cannot. Myers, although he obtained the grant for the whole 1,000 acres, never was a purchaser of that moiety, and he paid no consideration for it. He never claimed, or could claim, the equitable interest or right, of that moiety. He was entitled to one moiety, for locating and clearing the pre-emption out of the offices. These services were the consideration paid by him as an equivalent. He received a moiety as locator, which he sold to Craig. For that, and not for what is now claimed by the appellant, he paid a valuable consideration. Had William M’Nitt really been the heir at law, he would have held the other moiety as a trustee, for his benefit; but as Bernard, and not William, is really the heir at law of Joseph, Myers, were he before the court, would be considered a naked trustee for the true owner. Myers could not, as to the moiety now claimed by the appellant, protect himself by alleging he was a purchaser without notice; and, consequently, Logan, deriving tititle, with notice, through him, cannot be protected. As connected with this branch of the subject, it may be proper here to remark, that David Logan cannot be aided by the allegation that he purchased from M’Bride; because M’Bride never had the legal title vested in him.
The fifth inquiry will be, is such a partnership in the land, between Joseph and William, or such an agreement between them proved, as can benefit the defendant, Logan? We think there is not. The answer alleges the agreement to be, that Joseph should make an improvement for the joint benefit of himself and William; and that, if either died, and without issue, the whole should go the survivor. There is no satisfactory proof in the record, of such an agreement. The partnership is attempted to be proved by the depositions of Mitchell and M’Clelland. The weight and credibility of Mitchell’s deposition is greatly weakened, by the depositions of Collins, Logan and Frazier, proving that Mitchell repeatedly declared he knew nothing of the partnership or agreement between Joseph and William, except from hearsay. His deposition speaks in vague and general terms, of a partnership and arrangement, but without specifying particularly the *71 terms of the agreement. His expressions are, “ they were to be sharers in all;” but how sharers, he does not say; nor does he say he was present and heard the agreement made. But M’Clelland, who descends more to particulars, says the agreement was, that Joseph should make as many improvements for William as he made for himself. That the agreement was as stated by M’Clelland, is probable; for it is proved by some of the company who were improving with Joseph, that after they had made their improvements, and were about to return home, Joseph said he was to make an improvement for his brother William, and that they accordingly proceeded to make an improvement for William. This, so far from showing that they were to be in partnership, and to have a joint interest in each improvement, and that the whole should go to the suvivor, proves directly the contrary, and that they were to have several and distinct interests in their several improvements. The agreement of Joseph to make an improvement or improvements for William was a personal contract, for a failure in which, William might have a claim on the personal estate of Joseph; but can give no claim in equity to Joseph’s improvement, or to the land obtained by virtue thereof. From the evidence, it appears that Joseph performed his contract; that is, that he made an improvement for William; but for which, William laid in no claim before the court of commissioners. As it does not appear to us that such an agreement was ever made, as is set up in the answer, it will be unnecessary to decide what the legal effect of it would be, if sufficiently proved.
Upon the whole, we are of opinion that the appellant was entitled to the relief prayed in the bill, and that the general court erred in dismissing his bill with costs. Wherefore, it is decreed and ordered, that the said decree of the general court shall be, and the same is hereby reversed, annulled and set aside; and it is further ordered, that the suit be remanded to the said general court, with directions to enter up a decree, with costs, in favor of the said appellant, Bernard M'Nitt, against the appellee, David Logan, for that moiety of the said pre-emption of 1,000 acres in the proceedings mentioned, which is held by the said David Logan; and that the said court make such further orders and decrees in the premises, as may be necessary for *72 carrying this opinion and decree into complete effect. It is further ordered, that the said general court appoint commissioners to take and settle an account of the rents, profits, and improvements, &c. and to make such decrees and orders touching the same, as law and equity may require. And it is further decreed and ordered, that the appellee pay to the appellant his costs in this court expended.
Petition for a rehearing,
Laws of Virginia, Chan. Rev. p. 92.